**Harry BASTIAN, Jarlath W. Brady and Edwin Mulcahy, in their own right and as representatives of all other stockholders of Chicago Aerial Industries, Inc. similarly situated, Plaintiffs,**

**v.**

**BOURNS, INC., a corporation of the State of California and Bourns C. A. I., Inc., a corporation of the State of Delaware and Chicago Aerial Industries, Inc., a corporation of the State of Delaware, Defendants.**

Court of Chancery of Delaware.

New Castle.

July 31, 1969.

C. Waggaman Berl, Jr., of Booker, Leshem, Green, Shaffer & Berl, and H. James Conaway, Jr., and Jack B. Jacobs of Young, Conaway, Stargatt & Taylor, Wilmington, and Willson, Cunningham & McClellan of St. Louis, Mo., for plaintiffs.

E. N. Carpenter, II and Charles F. Richards, Jr., of Richards, Layton & Finger, Wilmington, for defendant Bourns, Inc.

MARVEL, Vice Chancellor:

Plaintiffs, who are the owners of 4,900 shares of stock of Chicago Aerial Industries, Inc., seek a permanent injunction against the proposed merger of such corporation into a resulting corporation known as Bourns/C.A.I., Inc. The fairness of the exchange ratio on which the merger agreement in question is based has been considered at trial and this is the Court's opinion on the trial evidence and briefs. Earlier in this proceeding the Court declined to grant plaintiffs' application for a restraining order against consummation of the proposed merger, being of the opinion that plaintiffs had not demonstrated that it was reasonably probable that they would ultimately succeed after final hearing. And while the merger was in fact approved by the requisite number of C.A.I. shares on June 12, 1969, the filing of the agreement of merger has been withheld to date by stipulation of the parties. Plaintiffs do not question the technical aspects of the merger under attack and appear to agree that a merger of C.A.I. into the Bourns complex is desirable. Only the proposed ratio of exchange is attacked.

Bourns, Inc. conducts a diversified business which consists of manufacturing and marketing a variety of sophisticated electronic instruments. About 35% of its business is done with the federal government. C.A.I.'s principal product among a number of so-called optical devices is a complex aerial camera. Over 90% of C.A.I.'s business is done with the federal government which uses such corporation's camera for aerial surveillance.

The defendant Marlan E. Bourns along with members of his family are the registered or beneficial owners of almost 75% of the outstanding stock of Bourns, Inc., a California corporation. If the merger here proposed is consummated, the 81% stock interest in the defendant Chicago Aerial Industries, Inc. now held by Bourns, Inc.

and its subsidiary, Bourns of Puerto Rico, will be turned over to a newly organized Delaware corporation, namely Bourns/C.A.I., Inc. C.A.I. will thereupon cease to exist as a viable corporate entity. Plaintiffs contend that the proposed exchange ratio of one share of C.A.I. stock for one share of stock of Bourns, Inc. is so unfair to the minority stockholders of C.A.I. that the consummation of the merger here proposed must, in good conscience, be enjoined [1] by Court order.

The principal architect of the proposed merger here under attack is Marlan E. Bourns who is president and chairman of the board of directors of both Bourns, Inc. and Chicago Aerial Industries. His interest in Bourns, Inc., coupled with that corporation's controlling interest in C.A.I., clearly puts Mr. Bourns in control of both corporations.

Furthermore, I was satisfied by the evidence adduced at trial that the exchange plan here under attack evolved primarily in the mind of Mr. Bourns and that such proposal was thereafter accepted by the boards of the respective companies without the help of any independent study in depth. Accordingly, inasmuch as Mr. Bourns and those beholden to him in a metaphorical sense clearly sat on opposite sides of the table in the formulation of the proposed merger here under attack, I concluded at trial that a fiduciary duty was owed by them to the minority stockholders of C.A.I., requiring that the interests of such stockholders be dealt with in an entirely fair manner. I accordingly determined that defendants must carry the burden of demonstrating the fairness of the merger now before the Court, Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 20, 89 A.2d 862, aff'd 33 Del.Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425. See also David J. Greene & Co. v. Dunhill International, Inc. (Del.Ch.) 249 A.2d 427, in which the ultimate decision on the fairness of a proposed merger, in which a fiduciary duty to minority stockholders was

1. At common law a single stockholder could prevent a merger, Reynolds Metals

Co. v. Colonial Realty Corp., 41 Del. Ch. 183, 190 A.2d 752.

also owed, was not reached due to a settlement.

The Court is not now concerned with the question as to whether or not objecting stockholders of C.A.I. (and they are substantial in number, being the holders of 19,735 shares) are entitled to withdraw from C.A.I. should it become merged into the resulting corporation and have their interests appraised, but rather with the question as to whether or not the equity of C.A.I.'s minority stockholders has been so drastically undervalued by the proponents of the merger as to call for injunctive relief against consummation of the proposed exchange as prayed for by plaintiffs. Plaintiffs actually favor a merger between their company and Bourns, Inc., but insist on a more favorable exchange ratio. As noted above, because it was my opinion at trial that the controlling officers and directors of Bourns, Inc. could not rely upon the business judgment rule to support their action, the burden was cast on them of entirely satisfying a carefully scrutinizing Court that they have acted fairly and in good faith in sponsoring and seeking to effectuate the transaction under attack, Sterling v. Mayflower Hotel Corp., supra.

Defendants argue, however, that they should not be required to shoulder such burden in view of the alleged ratification of an intercorporate transaction between self-dealing corporate officials by the vote of 37,351 shares of C.A.I. held by disinterested stockholders, citing 8 Del.C. § 144, Gottlieb v. Heyden Chemical Corporation, 33 Del.Ch. 177, 91 A.2d 57, and Lewis v. Hat Corporation, 38 Del.Ch. 313, 150 A.2d 750. However, in the Gottlieb case there was no suggestion that the beneficiaries of the option plan there under attack owned or controlled the votes of a majority of the stock, and in the Lewis case, the interested group held or controlled less than a majority of Hat Corporation stock, namely 42.7%. In the case at bar the claim of stockholder ratification is based on 37,351 ballots allegedly cast "in good faith" by stockholders outside of the Bourns hierarchy, the entire issued and outstanding stock of C.A.I. amounting to 563,000 shares, the Bourns' shares being 468,528 in number.

The exigencies of time and the facts concerning the respective values of Bourns and C.A.I. shares do not, in my opinion, warrant further research and perhaps the introduction of further evidence on the merits of the ratification theory relied on by defendants. In other words, because I have found that defendants have successfully carried the burden imposed on them by the rule of the Mayflower case and have concluded that an order enjoining the filing of the agreement of merger here in issue should not be granted, there is no need to consider further defendants' theory of minority stockholder ratification of an intercorporate transaction not negotiated at arms' length. But see Stryker & Brown, v. Bon Ami, C.A.1945, Ct. of Ch.Del. (unreported opinion of then Chancellor Seitz, March 16, 1964), and David J. Greene & Co., v. Dunhill International, Inc., supra.

Plaintiffs called several expert witnesses and introduced documentary evidence at trial concerning the comparative values of C.A.I. stock and those of Bourns, Inc. Plaintiffs' testimony and documentary evidence was basically designed to assess the respective asset values,[2] earnings values,[3] market values,[4] and potential intrinsic val-

---

2. Thus it is claimed that C.A.I. stockholders are being asked to contribute assets less liabilities at approximately $15 per share, while Bourns, Inc. shareholders are contributing about $6 per share. This calculation, however, ignores Bourns, Inc.'s existing holdings of C.A.I. stock.

3. Allegedly $1.38 to $1.00 in C.A.I.'s favor over the last five years but not over the last ten years. C.A.I. had losses in several such years.

4. Plaintiffs concede that Bourns, Inc., shares have held a 22% market value premium over C.A.I.'s, but claim a thin market for the latter to be largely responsible for this result.

ues of the stock of each company. On the basis of such evidence plaintiffs would have had the Court reach the conclusion that rather than a one for one exchange of stock between the companies involved, such proposed exchange should be on a basis which would recognize that each share of C.A.I. stock is actually worth (apparently in large part on a theory of capitalization of earnings) six dollars more than each share of Bourns, Inc. However, several computations of plaintiffs' experts ignore the fact that Bourns, Inc. has a substantial pre-merger interest in C.A.I., and plaintiffs' expert Dr. Caris' inconclusive view was that there was a "high probability" that one share of C.A.I. was worth more to a continuing investor than one share of Bourns.

Defendants, in turn, called their experts (one of whom, namely Mr. Stein, was the only witness for either side with any prior intimate knowledge of the affairs of Bourns, Inc. and of C.A.I.) and introduced documentary evidence at trial on other tests of value, such as profit as a percent of sales (Bourns, Inc.'s margin being over 5% in excess of C.A.I.'s on a ten year average since 1959), and return on equity (Bourns, Inc.'s being over double that of C.A.I.'s in each year between 1960 and 1968 except for 1964). Furthermore, Bourns' growth record over a ten year period was demonstrated as having resulted in 1968 net earnings of five times those of 1959, and that while C.A.I.'s growth has been steady, its net earnings in 1967 were actually less than those of 1959. In addition, Bourns' earnings per share were shown to have risen approximately 80% since 1964, while those of C.A.I. have increased only about 20%.

Turning to the critical information furnished to stockholders of C.A.I. in the May 12 proxy statement on the respective values of Bourns and C.A.I. stock, namely

earnings per share and book value, it appears that on a pro forma basis C.A.I.'s actual earnings per share in 1966 of $1.67 would on the basis of an assumed merger have been reduced to $1.14 per share, that in 1967 such earnings would have been reduced from $1.13 per share to $1.02 and in 1968 from $1.58 to $1.25. On the other hand, over the last ten years Bourns' total earnings per share have equalled those of C.A.I. On the same sort of pro forma computation, however, the book value per share of C.A.I. as of December 31, 1968 would be reduced from $14.86 to $7.35.

■ However, I have concluded, after consideration of the testimony of opposing experts as well as study of the documentary evidence, that there is no exact method of evaluating the comparative values of shares of corporate stock in a contemplated merger although market price would appear to be the most attractive element to the average investor. On the other hand, book value [5] appears to be largely unimportant to such an investor, particularly under contemporary accounting concepts. See Brundage v. New Jersey Zinc Co., 48 N.J. 450, 226 A.2d 585. Compare Sterling v. Mayflower Hotel Corp., supra. In other words, in addition to fallible statistical comparisons, there are many intangible elements affecting the values of securities which must be considered in passing on the fairness of an exchange ratio. C.A.I.'s business, being largely military, is subject not only to termination notices but to renegotiation proceedings and the like. Furthermore, when plaintiffs seek to rely on the statistics of comparatively large sums devoted to engineering and research by C.A.I., they fail to recognize that such outlay is largely government money. In contrast, Bourns' more diversified business is not as vulnerable [6] to change in government policy. In recent months, due to shifts in military production goals (viz. cancella-

---

5. As of the time of announcement of the proposed merger the market price of Bourns' shares was substantially higher than the book value of C.A.I. shares.

6. Thus in 1967, a year in which government cost control measures were introduced, C.A.I.'s net earnings decreased 32% compared to a 9% decrease on the part of Bourns.

tion of Cheyenne helicopter procurement), C.A.I.'s backlog of orders for surveillance equipment has been reduced and its work force cut down from about 1200 in February, 1968, to approximately 900 in May, 1969. In addition, the stock of Bourns, Inc. is traded on the New York and Pacific Coast Stock Exchanges where a ready market for investors is provided. C.A.I. stock, though traded in substantial amounts in 1968, must be sold on the less efficient over the counter market. The merger, if consummated, will provide former C.A.I. stockholders with a security which can be openly traded on national markets, an advantage in itself.

In short, therefor, the defendant Bourns, Inc. has demonstrated that the exchange ratio here proposed is not unfair, in that the advantages to C.A.I. shareholders of the merger here approved outweigh the possibility of a slight loss in earnings per share and a substantial loss in book value per share as a result of the merger. Those C.A.I. stockholders who wish to withdraw from the consolidated enterprise here envisioned should do so without disrupting an intercorporate transaction which is en-

couraged and favored by the laws of Delaware, MacFarlane v. North American Cement Corp., 16 Del.Ch. 172, 157 A. 396. Recent amendments to the Delaware Corporation Law reflect the continuing legislative approval of such policy.

Finally, it should be noted that in the case of David J. Greene & Co. v. Dunhill, International, Inc., supra, in which the Chancellor preliminarily enjoined the consummation of a merger not negotiated at arms' length, he concluded that while the book value of the stock of Spaulding, the corporation proposed to be merged into Dunhill International, was roughly twice that of the latter, as is the case here, the hypothetical earnings of Spaulding on a posited 1967 merger would have been reduced from $2.69 to $1.74 in 1967, and from $2.12 to $1.07 for the first half of 1968. No such drastic pro rata reduction of earnings has been demonstrated in the case at bar.

An order will be entered denying plaintiffs' prayer for a permanent injunction and entering judgment of dismissal in favor of the appearing defendant.