Emanuel G. ROSENBLATT, Joseph Gruss, Carolyn Skelly Burford, et al., Plaintiffs Below, Appellants,

v.

GETTY OIL COMPANY, Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: June 25, 1984.

Decided: May 9, 1985.

Irving Morris (argued) and Norman M. Monhait, Morris & Rosenthal, P.A., Wilmington, for Emanuel G. Rosenblatt, plaintiff below-appellant; William Prickett and Wayne J. Carey, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for Joseph Gruss, Carolyn Skelly Burford and the Gruss Entities, plaintiffs below, appellants.

Charles F. Richards, Jr. (argued), Donald A. Bussard, William J. Wade, Thomas A. Beck, Richards, Layton & Finger, Wilmington, for defendant below, appellee.

Before McNEILLY, MOORE, and CHRISTIE, JJ.

MOORE, Justice:

In this class action brought on behalf of the minority stockholders of Skelly Oil Company (Skelly) we review a Court of Chancery decision holding that the 1977 stock-for-stock merger of Skelly and Mission Corporation (Mission) into Getty Oil Company (Getty) was entirely fair to the plaintiffs.

For the first time since *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983), we address certain principles upon which the parties' basic disputes are centered. These include the allocation of the burden of proof on the fairness issue, the continued viability of the Delaware Block method of valuation, and the circumstances necessitating disclosure by a majority stockholder of the price it ultimately is prepared to pay the minority for its elimination. Applying the fairness analysis in *Weinberger,* we conclude that Getty, as the majority shareholder of Skelly, dealt fairly with the Skelly minority throughout the transaction. We also conclude that the stock exchange ratio in this merger was the product of sound valuation methods and arm's length bargaining. Accordingly, we affirm the trial court's decision on the merits.

I.

A somewhat detailed factual discussion is helpful to an understanding of the issues before us.

A.

*Background and Operations of the Companies.*

Immediately before this merger Getty directly owned 7.42% of Skelly's outstanding shares and 89.73% of Mission, which in turn held 72.6% of Skelly's stock.

Getty was a large petroleum company concerned primarily with the exploration for and development of crude oil and natural gas throughout the world. Its operations and activities were integrated vertically to include the exploration and development of petroleum, natural gas, and minerals both on land and offshore; the production and refining of petroleum and natural gas, both domestically and in other countries; the transportation of these products by its own fleet of five domestic and twelve international flag vessels, as well as by rail car, tank truck, and pipeline; the

manufacturing of petroleum products and chemicals; and the wholesale and retail distribution of these products in the United States and Phillipines.

Apart from Getty's operations and significant assets, qualifying it as an integrated oil company, Getty had important subsurface properties of oil and natural gas reserves in the United States, Canada, Spain, the Middle East, and the North Sea. Among the United States reserves was the Kern River field in the San Joaquin basin of California.[1]

Getty's foreign holdings included reserves in the Piper and Claymore fields located in the British North Sea.[2] Getty held a 23.5% interest in Piper, estimated in 1975 to contain 642 million barrels of recoverable oil reserves. Getty's share of the crude oil reserves for the Piper and Claymore fields was estimated at 132 and 73 million barrels, respectively. Getty's 1975 annual report listed Claymore's estimated recoverable oil reserves at 356 million barrels. Apart from its North Sea properties, Getty also had offshore interests in Spain, Sumatra, the South China Sea, Algeria, Iran, and the Saudi Arabia—Kuwait Partitioned Neutral Zone, an area of disputed ownership administered jointly by both nations. Getty owned uranium, coal, gold, copper and oil shale reserves in the United States, and maintained an interest in uranium—gold ore reserves in Australia's Northern Territory.

Like Getty, Skelly was an integrated oil company with far flung, diversified operations and activities at the time of the merger. Skelly had significant domestic offshore petroleum reserves in the production stage, as well as large leaseholdings onshore in North America. The latter included 325,000 acres in the Powder River Basin of Montana and Wyoming. Internationally, Skelly had a 25% interest in a 500,000 acre concession, including the Mubarek field, in the Persian Gulf.[3] Skelly also had a 31.25% interest in the Heather field in the North Sea.[4] It was disclosed that in 1975, 59% of Skelly's crude oil production was a result of enhanced recovery techniques, principally waterflooding.

Beyond its oil reserves, Skelly owned 50% of a wood products manufacturer, held 50% of a petrochemical manufacturer, and maintained interests in two pipeline companies, a Republic of Korea fertilizer manufacturer, a domestic fertilizer plant in Clinton, Iowa (the Hawkeye plant), and a tim-

1. Discovered in the early 20th century, Kern River is the second largest field in the San Joaquin basin, which is 250 miles long and 55 miles wide and which is itself one of the major producing basins in California. J.P. Riva, Jr., World Petroleum Resources and Reserves, at 173 (1983). Kern River is a "heavy oil" field. *Id.* at 175. It represents 35% of Getty's oil reserves. Thermal recovery methods involving the use of steam have been employed at Kern River since the early 1960's. However, federal and state environmental regulatory action caused delays in increases in the use of steam at Kern River, and as of March 15, 1976, approval for the use of 62 steam generators had not been granted.

2. Piper, discovered in January 1973, is located in the Moray Firth basin about 60 miles from the Orkney Islands. American Association of Petroleum Geologists, Giant Oil and Gas Fields of the Decade: 1968–78, at 131–32 (1980 ed. Michel T. Halbouty) (hereinafter cited as Halbouty). Its estimated recoverable reserves are 88 million tons. J. K. ·Klitz, North Sea Oil:

Resource Requirements for the Development of the U.K. Sector, at 219 (1980). British governmental regulatory bodies approved drilling at Piper in October 1976, and the first production well was spudded on October 10, 1976. *Halbouty, supra,* at 131–32. Production began on December 7, 1976 at 30,000 barrels per day. *Id.* The Claymore field, a moderately large field by North Sea standards, is located twenty miles west of the Piper field. J.K. Klitz, North Sea Oil: Resource Requirements for the Development of the U.K. Sector, at 149 (1980). Claymore's recoverable reserves are estimated to be 55 million tons, and production began there in November 1977. *Id.*

3. The Mubarek field was discovered in 1972, and contained low-sulfur crude. International Petroleum Encyclopedia, vol. 13, at 245 (1980). Production began in March 1976 and averaged nearly 8,100 barrels per day in 1976.

4. A discovery well drilled in 1975 at Heather yielded crude oil at a rate of 5,222 barrels per day.

ber concession in Liberia, where it was building a saw mill and plant. It also owned and operated a crude oil refinery in Kansas with an approximate daily capacity of 90,000 barrels, as well as a natural gas plant in Texas. Skelly's operations included oil and gas exploration and development, the production, transportation, refining and sale of crude oil and natural gas, and wholesale and retail marketing.

Mission was a Nevada corporation controlled by Getty, and was primarily an investment company with minimal assets other than its Skelly stock.

## B.

*Merger Discussions and Negotiations*

Until his death on June 6, 1976, J. Paul Getty, the majority shareholder of Getty, had continually opposed the merger of Getty and Skelly. His reasons were varied, but they apparently centered on his notion that a healthy competition existed between the two companies which enhanced their profitability to a greater extent than the synergy to be anticipated from a merger.

However, there were others with differing views. At the May 1976 annual meeting of Mission an attorney representing Joseph Gruss, a Skelly minority shareholder, argued for a merger of Mission into Getty, and threatened suit on his client's behalf. In late June or early July 1976, after Mr. Getty's death, Harold E. Berg, then Getty's executive vice president and chief operating officer, met with C. Lansing Hays, Jr., a Getty director and counsel to Getty, and Moses Lasky , another Getty lawyer, to explore the anti-trust implications of a merger.[5] They noted that since a Getty-Mission merger also would require a valuation of Mission's 72.6% interest in Skelly, a merger of all three companies would be more efficient. At trial Berg testified that one of the reasons for the proposed merger was to minimize stock-

holder dissension by meeting the demands of persons like Joseph Gruss.

On July 12, 1976, Berg called James E. Hara, president of Skelly, to inform him that a combination of Getty, Skelly, and Mission was being considered. Berg suggested a conference of high-level Getty and Skelly personnel. This meeting was held in Dallas, Texas, on July 15, 1976, attended by the principal officers of both companies. All acknowledged the desirability of a merger. The consensus was that the fairest way to achieve this result would be an exchange of common stock, continuing shareholder participation in a larger post-merger company. Thereafter, a memorandum was distributed summarizing the pertinent legal considerations affecting the proposal.

Generally, it was agreed at the July 15 meeting that DeGolyer and MacNaughton (D & M), a Dallas, Texas, petroleum engineering firm with an outstanding reputation, would assist the parties in evaluating their respective oil, gas and mineral reserves. D & M had worked periodically with both Skelly and Getty since 1939, and had prepared annual estimates of oil and gas reserves for both companies for many years. In addition, D & M had begun preparing annual reports on Getty's mineral properties for the last several years prior to the merger. Accordingly, D & M was contacted on July 15, 1976 by Getty and Skelly and asked to estimate the reserves of both companies, to make an economic valuation based on those estimates, and then to deliver this analysis to the companies for their use in negotiating the merger exchange ratio.

After the July 15 Dallas meeting, Getty and Skelly promptly began evaluating their respective surface and subsurface assets. It is clear that both parties devoted substantial internal resources in preparing to negotiate the exchange ratio of Getty and Skelly stock. In addition, both companies

---

**5.** One advantage of a merger was the reduction in exploration, development, and production costs, given the increased reserves of the surviving corporation. Another advantage was the elimination of duplicative managerial positions.

hired reputable investment banking firms to assist in the valuation task, and to render opinions on the fairness of the merger's ultimate terms. Getty retained Blyth, Eastman, Dillon & Co. ("Blyth Eastman"), and Skelly chose Smith Barney, Harris Upham & Co. ("Smith Barney").

Significantly, Skelly and Getty approached the merger with entirely different objectives which remained constant throughout the negotiations. Already, Getty had been threatened with suit by Gruss, a Skelly minority shareholder, and had every expectation that the transaction would lead to litigation. Thus, it carefully sought to comply with applicable Delaware law in meeting the test of complete fairness. It was for this reason that in negotiating the exchange ratio Getty recommended use of the Delaware Block method to value the companies' stock.[6] Skelly's object on behalf of its minority shareholders was one of direct economic interest—to obtain the best possible price for its stock by a highly favorable exchange ratio of Skelly to Getty shares.

In utilizing the Delaware Block method, Skelly attempted to maximize the weight given to surface assets, while minimizing the importance of subsurface properties, i.e., oil, gas, and mineral reserves. This tactic was born of Getty's far more significant estimated reserves. Skelly also emphasized current earnings, because of its 1976 record profits. Finally, because the market price of Getty's stock was much higher, Skelly tried to reduce the weight given this element of value.

As to their surface properties, each company began compiling an asset book cataloging an item by item value of all their respective above-ground holdings, such as refineries, manufacturing plants, pipelines, transport facilities, etc. Along with the dollar amount accorded each item, there also was a description of the valuation method or methods used to calculate that figure. The asset books, once completed, were to be exchanged. The two companies would then negotiate surface property values for inclusion in their asset factors under the Delaware Block formula. As to their respective subsurface holdings, D & M was to update the reserve estimates of Getty and Skelly with the assistance of each company's personnel. D & M was then to make an economic projection, based on these estimates, for use by the parties in negotiating an exchange ratio.

On September 29, 1976, Getty and Skelly exchanged asset books. Getty immediately discovered that for every item of property listed, Skelly had selected the particular valuation method, irrespective of consistency, which produced the highest asset value. There is testimony that this adversarial approach angered Getty personnel. In contrast, Getty had applied a more consistent, conservative technique of valuing its surface assets. It claims to have done so because of the threat of post-merger litigation. Despite this disparity in approach, Getty and Skelly maintained contact and sought to resolve their differences through hard bargaining. Eventually, they reached accord.

However, while the surface asset books were compiled, exchanged, and their contents negotiated, the companies had numerous meetings with D & M regarding the valuation of their reserves. D & M had begun a field-by-field, lease-by-lease analysis of the oil, gas, and mineral reserves of the parties, working with the Getty or Skelly personnel most familiar with the specific field under study. D & M also examined proprietary information each company maintained regarding its own reserve estimates. D & M then took this information

---

6. At that time, this was the exclusive technique used in appraisal and other stock valuation proceedings. Elements of value, including assets, earnings, and market price are given a dollar figure, assigned percentage weights, and then summed to yield a weighted average value per share. *See, e.g., Sporborg v. City Speciality Stores, Inc.*, Del.Ch. 123 A.2d 121, 124 (1956); *Heller v. Munsingwear, Inc.*, Del.Ch., 98 A.2d 774, 777 (1953); *In re General Realty & Utilities Corp.*, Del.Ch., 52 A.2d 6, 14–15 (1947).

and began preparing an economic analysis for use by the companies in their negotiations. This study required the selection and use of certain projections, including future prices, interest and discount rates, and future expenses, such as taxes and operating costs. Invariably, disputes arose between the two sides as to the values used by D & M, particularly regarding future prices of petroleum products. Therefore, at the suggestion of the parties D & M made an alternative analysis using (1) different pricing projections provided by Getty, Skelly, and their respective investment bankers and (2) a D & M alternative pricing scheme based on anticipated Federal Energy Administration reduction of price differentials for different grades of oil. This economic analysis of the Getty and Skelly subsurface assets was completed by D & M around October 25, 1976. However, Getty and Skelly continued to disagree on the variables applied by D & M, particularly its projection of future prices in valuing the reserves.

It therefore became evident to the chief negotiators on each side that they would be unable to agree upon such variables, even though both parties concurred in D & M's reserve estimates. This pessimism was reinforced by the difficulties encountered in the earlier, but by then completed, surface asset negotiations.

On October 25th and 26th, Getty, Skelly, their investment bankers, and D & M met to finalize the previously negotiated surface asset values, and to discuss subsurface asset problems. With the issues of the surface asset values then behind them, the parties focused on disputes regarding the dollar value of their respective reserves. At issue were the "imponderables" to be used by D & M in appraising the reserves, and it soon became apparent that the parties were at an impasse.

Thus, on October 27, 1976, Berg of Getty proposed that each side delegate to D & M the task of calculating the present fair market value of their respective reserves, given the obstacles presented by the projections and variables. Skelly concurred, and D & M accepted the task with the understanding that its methods would not be revealed to the parties. In addition, Getty, Skelly, and Mission agreed that D & M's valuation would be final and binding upon them. With this accord, D & M rendered its estimates on October 29, 1976.

On the morning of November 1, 1976, the parties and their investment bankers then met to determine a stock exchange ratio for the merger based upon valuations utilizing the Delaware Block method. In particular, the parties sought to negotiate per share values for the asset, earnings, and market price factors, as well as the percentage weight to be assigned each element. Getty anticipated an exchange ratio of between .46 to .55 shares of its common stock for one share of Skelly common. Morgan, Skelly's spokesman, stressed the importance of earnings over assets and emphasized the market's undervaluation of Skelly stock. He therefore proposed .7 as the right figure.

There was testimony that this suggestion angered the Getty representatives, who viewed it as absurdly high. Kenneth Hill of Getty countered with a possible exchange ratio of .5. Thereafter, the parties discussed the elements of assets, earnings, and market price, including their subratios, and how they should be weighted under the Delaware Block method. While each side criticized the other, the negotiations slowly progressed. By the afternoon of November 1, Getty was offering a ratio of .57 and Skelly was proposing .61.

However, at this point the parties reached an impasse. Berg of Getty suggested terminating the discussion. Hays, a Getty director and its counsel, drafted a press release announcing the end of merger negotiations. As the meeting broke up, Hara of Skelly strongly urged Berg to continue the discussions. He persuaded Berg to consult with the Getty board of directors at its next meeting on November 5, 1976.

Berg did so, and at their meeting, Getty's directors concluded that .58 was the high-

est acceptable exchange ratio. Berg relayed this to Hara by telephone on the afternoon of November 5. Hara then suggested another meeting between Getty and Skelly on November 7 at the annual session of the American Petroleum Institute, a function which certain Getty and Skelly personnel would have attended anyway. Berg agreed.

At the November 7 meeting, Berg reiterated Getty's firm position that .58 was the highest acceptable exchange ratio. After discussion, the Skelly representatives left the room and met privately. At this point, a Skelly team member suggested that their company's earnings be adjusted to reflect a weighted average of only the last three years, rather than the past five years. It was noted that two of the last three years saw Skelly's highest historical earnings, and that Getty itself had used such a method in a prior transaction. Skelly presented this adjustment with a correlative new exchange ratio of .5875 to Getty. After a private caucus Getty agreed to the earnings revision and offered a ratio of .5875 Getty shares for one share of Skelly stock. Skelly accepted. Thus, as finally negotiated, the parties agreed to the following valuation:

| | Ratio of value of Skelly Share to Getty Share | Percentage Weighting | Weighted Ratio of Skelly Share to Getty Share |
|---|---|---|---|
| Assets | .525 | 47.5% | .2494 |
| Earnings | .667 | 47.5% | .3168 |
| Market Price | .427 | 5.0% | .0213 |
| Exchange Ratio | | | .5875 |

On November 13, 1976, the Skelly and Getty boards met to consider the merger. After a thorough review of the whole matter, Skelly's independent directors, and then its entire board, approved the agreement for submission to Skelly's shareholders. Similarly, Getty's board voted unanimously for the merger. On January 25, 1977, the shareholders of both companies assented to the transaction. Of Skelly's minority shares voted at the meeting, 89.4% favored the merger. In terms of all outstanding Skelly minority shares, this represented a vote of 58% in favor of the

proposal. Skelly and Mission were merged into Getty on January 31, 1977.

On February 18, 1977, this class action was brought against Getty, challenging the fairness of the .5875 exchange ratio. After six and one-half years of discovery and twenty-three days of trial, the Chancellor held that the merger, and in particular the exchange ratio, were entirely fair to the Skelly minority.

## II.

The plaintiffs challenge the fairness of the transaction, including the exchange ratio and the propriety of delegating the final subsurface asset valuation to D & M. Plaintiffs also claim that the proxy statement failed to disclose the secrecy of D & M's methods in valuing the respective companies' reserves, and that the proxy statement misled Skelly's minority shareholders into believing that Skelly and its investment banker had carefully reviewed D & M's subsurface valuation.

As to the fairness of the merger price, plaintiffs claim that exclusive use of the Delaware Block method yielded a value of $110 per share, considerably less than Skelly's appraised asset value of $195 per share. Plaintiffs argue that they suffered a dilution of their earnings and dividends per share. Finally, they claim that the merger price was flawed by certain fundamental misconceptions of Getty's negotiators regarding the future prospects of both companies.

As to fair dealing, plaintiffs contend that Getty failed to disclose a projected $52 million reduction in earnings. Plaintiffs also allege that Getty used its controlling position to force Skelly's acceptance of the merger, that Getty coerced Skelly into using the Delaware Block method, and generally, that Getty dominated Skelly's negotiators.

In response, Getty asserts first, as to fairness of price, the Delaware Block method was the sole valuation technique approved by Delaware courts in 1976, and that the resulting Getty-Skelly exchange

ratio was entirely fair to the Skelly minority. Moreover, no dilution of dividends was in fact suffered by the minority. Second, as to its conduct, Getty contends that it acted fairly throughout the course of the transaction. Regarding the proxy statement, defendant argues that it fully disclosed all facts material to approval of the merger. Finally, Getty contends that the delegation to D & M of the reserves valuation was entirely proper.

## III.

The parties have raised many issues, but in disposing of this appeal we address only the central points they basically present: (1) the intrinsic fairness of the merger, (2) the allocation of the burden of proof at trial, (3) the propriety of delegating the asset valuation to D & M, and (4) whether the proxy statement satisfied the strict and unyielding disclosure requirements of Delaware law. Throughout, our standard of review is governed by *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

## A.

In *Weinberger v. UOP.*, Del.Supr., 457 A.2d 701, 710 (1983), we stated that "[t]he requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Id.* [citing *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 110 (1952); *Bastian v. Bourns, Inc.*, Del.Ch., 256 A.2d 680, 681 (1969), *aff'd*, Del.Supr., 278 A.2d 467 (1970); *David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427, 431 (1968)]. We further stated that the concept of fairness has two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness. *Weinberger*, 457 A.2d at 711.

As to fair dealing, we noted in *Weinberger* that the concept included issues of when the transaction was timed, how it was initiated, structured, negotiated, and

disclosed to the board, and how director and shareholder approval was obtained. *Id.* We consider all the foregoing principles applicable here. *See also Bastian v. Bourns, Inc.*, Del.Ch., 256 A.2d 680, 681 (1969), *aff'd*, Del.Supr., 278 A.2d 467 (1970); *David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427, 431 (1968).

## B.

■ Beginning with the burden of proof, we agree with the trial court that the plaintiffs' allegations were sufficient to challenge the fairness of the merger ratio. *Weinberger*, 457 A.2d at 703. Clearly, Getty, as majority shareholder of Skelly, stood on both sides of this transaction and bore the initial burden of establishing its entire fairness. *Id.* However, approval of a merger, as here, by an informed vote of a majority of the minority shareholders, while not a legal prerequisite, shifts the burden of proving the unfairness of the merger entirely to the plaintiffs. *See id.* Getty, nonetheless, retained the burden of showing complete disclosure of all material facts relevant to that vote. *See id.*

## C.

■ On the basis of this record we are satisfied that Getty dealt fairly with Skelly throughout the transaction. Indeed, the adversarial nature of the negotiations completely supports a conclusion that they were conducted at arm's length. There is no credible evidence indicating that Getty, as the majority shareholder, dictated the terms of this merger. If anything, the facts are to the contrary. Thus, what we have here is more than the theoretical concept of what an independent board might do under like circumstances. *Johnston v. Greene*, Del.Supr., 121 A.2d 919, 925 (1956). Instead, it is clear that these contending parties to the merger in fact exerted their bargaining power against one another at arm's length. This is of considerable importance when addressing ultimate questions of fairness, since it may give rise

to the proposition that the directors' actions are more appropriately measured by business judgment standards. *Compare Sinclair Oil Corporation v. Levien,* Del. Supr., 280 A.2d 717, 720 (1971); *Getty Oil Company v. Skelly Oil Company,* Del. Supr., 267 A.2d 883, 886–887 (1970); *Beard v. Elster,* Del.Supr., 160 A.2d 731, 738 (1960); *Puma v. Marriott,* Del.Ch., 283 A.2d 693, 695 (1971). The facts show that prior to the initiation of merger negotiations Getty knew that it would be sued. Thus, it sought to structure the transaction to meet the standards imposed by Delaware law. At the initial meeting held on July 15, 1976, Getty and Skelly management were given a legal research memorandum on valuation methods approved by Delaware courts. Moreover, Getty was cognizant of the potential conflicts among the interlocking managements of both companies. Accordingly, at the July 15, 1976 meeting, when Getty designated Kenneth Hill of Blyth Eastman as its chief negotiator, Hill immediately resigned from Skelly's board on which he had served for ten years. Similarly, a partner in the law firm Hays, Landsman & Head, resigned from the Skelly board because the law firm was representing Getty.

As to the structure of the actual negotiations, Getty and Skelly agreed on July 15, 1976 to have D & M estimate their respective reserves and analyze their future prospects. Getty and Skelly also agreed to evaluate separately their respective surface assets and then, negotiate those values. The Chancellor properly found that both corporations devoted substantial economic resources and manpower to the latter effort. The trial court also properly found that the objectives of Getty and Skelly were vastly different. Getty sought a safe harbor for the merger; Skelly sought the highest price possible. *See Weinberger,* 457 A.2d at 710.

■ As to the negotiations themselves, it is obvious that the divergence in objectives insured the arm's length quality of the bargaining between the Getty and Skelly teams on asset value.[7] In fact, Skelly's attempt to obtain the highest possible value, irrespective of the inconsistencies in its approach, nearly caused the collapse of negotiations on at least two occasions: on September 29, when the surface asset books were exchanged, and on November 1 when Skelly opened with a bid of .7. Moreover, Skelly's persistent efforts to obtain a high price forced the parties to turn to D & M to render, alone, the final subsurface asset value. The evidence indicates that this course of action favored Skelly, given Getty's far greater reserves and D & M's practice of making ultra-conservative reserve estimates.

Plaintiffs seek to compare this action to *Weinberger* by claiming that a memorandum, dated October 14, 1976, prepared by Robert J. Menzie, a Getty financial officer, was never disclosed to Skelly. In particular, plaintiffs liken this document, projecting a $52,165,000 after-tax decrease in Getty's 1976 earnings, in comparison to its 1975 earnings, to the Arledge and Chitiea report in *Weinberger,* which indicated that the majority shareholder, Signal, still considered the elimination of the minority an "outstanding investment opportunity" even at a price higher than that actually being offered. *See Weinberger,* 457 A.2d at 705, 708, 712. However, the two reports are factually and legally different. First, it is not clear that Skelly and its negotiators were unaware of Getty's projected earnings decrease. Morgan, one of Skelly's investment bankers and principal negotiators, testified on cross-examination:

---

7. On July 15, or 16, 1976, Hara, Skelly's president, formed a team to negotiate the merger for Skelly, consisting of Hara, Harold C. Stuart, an outside director with 18 years on the Skelly board, and Robert Miller, then executive vice-president of Skelly. Similarly, Getty selected Kenneth Hill of Blyth Eastman to be its chief negotiator; Hill resigned his Skelly directorship on July 15, 1976. This independent bargaining structure, while not conclusive, is strong evidence of the fairness of the merger ratio. *See Weinberger,* 457 A.2d at 709–11; 709 n. 7. However, the use of such a committee is not essential to a finding of fairness.

Mr. Morris, I unfortunately can't at this stage go back five years and remember exactly what numbers were given to me. In the normal course of business, you may be sure that when I went into the room on November 1st somebody in my group knew what the earnings projections of Getty were and had given me that information or had it there so, if the subject was necessary to be discussed, I could use it. And I do not recall at this time specifically what information it was, but I can assure you it was there.

Second, the Arledge-Chitiea report, used secretly by and exclusively for Signal, was prepared by two Signal directors, who were also UOP directors, using UOP information obtained solely in their capacities as UOP directors. *Weinberger*, 457 A.2d at 705. Here, the decreased earnings projection was prepared by a member of Getty's management for Getty's use as part of its annual reporting function. Moreover, there is not the slightest indication that its disclosure could have materially affected the exchange ratio negotiations. *See id.* at 709, 712. Third, the merger in *Weinberger* was expressly conditioned on approval of a majority of UOP's minority shareholders; here, there was no such condition. *See id.* at 707.

While it has been suggested that *Weinberger* stands for the proposition that a majority shareholder must under all circumstances disclose its top bid to the minority, that clearly is a misconception of what we said there.[8] The sole basis for our conclusions in *Weinberger* regarding the non-disclosure of the Arledge-Chitiea report was because Signal appointed directors on UOP's board, who thus stood on both sides of the transaction, violated their undiminished duty of loyalty to UOP. It had nothing to do with Signal's duty, as the majority stockholder, to the other shareholders of UOP.[9]

As to the approval of the merger proposal by the Getty and Skelly boards, the record shows that their action was taken on an informed basis. *See Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984); *Kaplan v. Centex Corp.*, Del.Ch., 284 A.2d 119, 124 (1971). At Skelly's board meeting, the directors were fully briefed by Smith Barney and by Blyth Eastman, on the basis of copies of valuation books prepared and distributed by the two investment banks. Skelly's directors had been given copies of the proxy statement prior to the meeting. Skelly's board received a legal opinion on the merger, as well as copies of D & M's final estimate. The directors also heard from the attorney representing Gruss, the Skelly shareholder who had been threatening suit since May 1976. The record also shows that certain Skelly directors, including outside director Stuart, who controlled more stock than the plaintiff class, questioned Getty representatives Garber and Thompson, as well as Skelly management, on the fairness of the exchange ratio. Following this discussion, Copley, Jones, and Williams, who were Getty and Mission officers, as well as Skelly directors, were excused from the Skelly board meeting. Outside director Stuart moved to approve the proposed merger ratio. The resolution was unanimously adopted. Copley, Jones, and Williams returned and concurred with the resolution. At the Getty board meeting, Getty's directors were given a similar, in-depth briefing on the proposed merger, and voted to approve it.

### D.

Regarding the second aspect of fairness, fair price, we note initially that

**8.** *See* Herzel and Colling, *Establishing Procedural Fairness in Squeeze-Out Mergers After Weinberger v. UOP*, 39 Business Law. 1525, 1532 (1984); Herzel and Colling, *Squeeze-Out Mergers in Delaware—The Delaware Supreme Court Decision in Weinberger v. UOP*, 7 Corp.L.Rev. 195, 207 (1984).

**9.** *See* Payson and Inskip, *Weinberger v. UOP, Inc.: Its Practical Significance In The Planning and Defense of Cash-Out Mergers*, 8 Del.J. Corp.L. 83, 89 (1983).

"in a non-fraudulent transaction ... price may be the preponderant consideration outweighing other features of the merger". *Weinberger,* 457 A.2d at 711. Fair price involves all relevant economic factors of the proposed merger, such as asset value, market value, earnings, future prospects, and any other elements that affect the inherent or intrinsic value of a company's stock. *Id.* Thus, in *Weinberger* we authorized proof of value in appraisal and other stock valuation cases by any techniques or methods generally considered acceptable in the financial community and otherwise admissible in court. *Id.* at 713. In addition, we ruled that the Delaware Block formula was no longer the *exclusive* mechanism of value precluding other generally accepted techniques. *Id.* at 712–13. We stated further that only speculative elements of value due to the accomplishment of the merger are excluded from 8 *Del.C.* § 262(h). However, elements of future value known or susceptible of proof at the date of the merger do not fall within this narrow exclusion and may be considered, along with damages, including rescissory damages. *Id.* While the plaintiffs challenge the defendant's use of the Delaware Block method, that was the only valuation technique permitted at that time. In any event, *Weinberger* did not abolish the block formula, only its exclusivity as a tool of valuation. We find no legal error or abuse of discretion by the Chancellor's action in accepting its use here.

In terms of the concept of fair price, *Weinberger* is consistent with *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107 (1952), where this Court stated that the correct test of fairness is "that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before". *Sterling,* 93 A.2d at 114. *See Porges v. Vadsco Sales Corp.,* Del.Ch., 32 A.2d 148, 151 (1943) ("[t]o arrive at a judgment of the fairness of the merger, all its terms must be considered").

In *Sterling,* the plaintiffs challenged the fairness of the terms of a stock-for-stock merger of Mayflower Hotel Corporation into its parent/majority shareholder, Hilton Hotel Corporation. *Id.* at 108. Inquiring into whether the facts supported the fairness of the stock conversion ratio, the Court in *Sterling* carefully scrutinized a pre-merger, outside study comparing the book values, market values, and earnings, but not the asset values of the two companies. *Id.* at 109, 115. Disposing of plaintiffs' objection to the report's failure to appraise physical assets and to determine net asset value, this Court stated that while all relevant factors must be considered, no one factor is in every case given greatest weight. *Id.* at 115–16 [citing *Cole v. National Cash Credit Ass'n,* Del.Ch., 156 A. 183, 188 (1931); *Allied Chemical & Dye Corp. v. Steel and Tube Co. of America,* Del.Ch., 122 A. 142, 144 (1923)]. The Court stated further that the relative importance of the several tests of value depends upon the circumstances of each case. *Id.* The Court in *Sterling* then reasoned that net asset value was of less importance than earning power given the nature of the assets of the two companies. *Id.* 115–16.

■ After careful scrutiny of the methods employed by the parties, the process of information gathering, the negotiations, and all relevant economic and financial factors, we conclude that the Chancellor's findings regarding fairness of the price paid the Skelly minority shareholders were entirely correct.

As noted earlier, Getty and Skelly were given a legal opinion on mergers under Delaware law at the July 15, 1976 meeting. Thus, from the outset, both sides were aware of the exclusive valuation method then approved by the courts of this State, the so-called Delaware Block formula. Both parties sought to follow this method in reaching the ultimate stock exchange ratio. They were entirely correct in doing so. *See, e.g., Universal City Studios, Inc. v. Francis I. duPont & Co.,* Del.Supr., 334 A.2d 216, 218 (1975); *Application of Delaware Racing Ass'n,* Del.Supr., 213 A.2d 203, 209–13 (1965); *Tri-Continental Corp.*

*v. Battye,* Del.Supr., 74 A.2d 71, 72 (1950). At the time there had not been any judicial relaxation of the exclusivity of this method as ultimately occurred in *Weinberger,* 457 A.2d at 712–13.

The record indicates that with the block formula in mind, Getty and Skelly embarked on a lengthy and detailed review of their asset values, which both companies justifiably believed were of primary importance. *See Bell v. Kirby Lumber Corp.,* Del.Supr., 413 A.2d 137, 142 (1980); *Abelow v. Symonds,* Del.Ch., 173 A.2d 167, 171 (1961). This approach was based on legal opinions and on the recognition, shared by both corporations, that the real worth of an oil company is centered in its reserves. The record shows that this belief in the importance of asset value was still shared as of the final rounds of bargaining on November 1 and 7, 1976. Getty and Skelly diverted substantial resources to their respective asset reviews, each using hundreds of employees and retaining reputable investment bankers. Getty and Skelly also employed D & M, a petroleum consulting engineering firm with a worldwide reputation and more importantly, with nearly 37 years of experience in estimating Getty's and Skelly's respective oil and natural gas reserves.

The surface asset values agreed upon were the product of this lengthy review and several weeks of asset-by-asset bargaining between the parties. The negotiations clearly were adversarial. Getty personnel were shocked by Skelly's overstatement of its surface asset values, and the negotiations almost collapsed. *See Weinberger,* 457 A.2d at 709 n. 7 & 710. As to subsurface asset value, the negotiations were such that the parties could not agree, and therefore, requested D & M to render the final estimate. Significantly, we note that on appeal plaintiffs do not directly

challenge the asset value eventually agreed upon by Getty and Skelly.

Based on the components of the .5875 exchange ratio, Skelly succeeded in obtaining an equal weighting of earnings and assets, despite Getty's recognition that assets were of prime importance, and that under Delaware law assets are often given greatest weight. *Bell,* 413 A.2d at 142; *Abelow,* 173 A.2d at 171. As to the three-year weighted earnings average used, it must be observed that the 1976 annualized income was Skelly's highest in history. Moreover, the 1976 earnings were given a triple weight. *See Universal City Studios, Inc. v. Francis I. duPont & Co.,* Del. Supr., 334 A.2d 216, 218 (1975); *Adams v. R.C. Williams & Co.,* Del.Ch., 158 A.2d 797, 800 (1960). Second, we note that Skelly's earning power, relative to Getty, was at its zenith. For example, Getty's huge reserves in the Piper and Claymore fields were slated for production in December 1976. Getty's Kern River Field, amounting to 35% of its total crude oil reserves, was producing about 1,650,000 barrels per month in 1974, and Getty expected the FEA and state moratorium on steam recovery to be lifted, increasing recovery rates. In contrast, Skelly's single largest field was the Velma field in Stephens County, Oklahoma, a secondary recovery operation producing 400,000 barrels per month as of early 1974. Velma constituted 26% of Skelly's reserves.[10] Skelly's Mubarek field off Sharjah was expected to decline in production revenues between 1976 and 1977 from $12.4 million to $6.4 million. Third, Skelly succeeded in belittling the market price of the companies' stocks, notwithstanding that Getty shares were selling at a much higher price. *See In re Olivetti Underwood Corp.,* Del.Ch., 246 A.2d 800, 809 (1968). Finally, the record is replete with evidence of Skelly's recognition that the

---

**10.** In 1973 and 1974, Velma had been "frac'd", i.e., fracturing methods had been applied to its wells. Fracturing is the use of any processes, such as hydraulics, chemicals such as acid, or other materials such as high-energy gas, sand, water, or petroleum to enhance an oil and gas

well recovery operation, usually by introduction into the well bore. Bender's Oil and Gas Law: Manual of Oil and Gas Terms, at 43 (Supp.1983) (Williams, Howard R. & Meyers, Charles J.). *See* 17 Okla.Stat.Ann. § 54 (1981).

relative positions of the two companies would not be as favorable to Skelly within the foreseeable future, and that the merger would result in a more competitive, efficient company, thereby benefiting the Skelly stockholders who would maintain a continued ownership interest in the surviving company. The inference is that the recognition impelled Skelly to set a year-end deadline for the merger and to try again on November 7.

To rebut the claim of fair price, plaintiffs presented the conclusions of a corporate finance expert who charged both parties with errors in arriving at the exchange ratio. In particular, plaintiffs contend that five misconceptions skewed the ratio and resulted in a 26% earnings dilution for Skelly's shareholders. The five errors were that Skelly's 1976 record high earnings were due to exploration cut backs, that these earnings were also due to rapid reserve depletion, that Getty had a more aggressive exploration program, that Getty's record of finding oil was better, and that Getty's future looked far better than Skelly's. Plaintiffs' expert presented an analysis of ten comparable arm's length oil mergers producing a consideration equal to or greater than asset value per share.

■ As for the plaintiffs' expert testimony, we agree with the trial court's conclusion that it was unpersuasive, based on the noncomparability of the ten mergers selected, and on the unverified asset values employed. *See David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 433 (1968). In addition, this testimony concludes that Skelly's minority shareholders should have received Getty stock equivalent to the liquidation value of Skelly. This contention was laid to rest in *Sterling,* 93 A.2d at 116. In Delaware a company is valued as a going concern, not on what can be obtained by its liquidation. With respect to the five misconceptions raised by plaintiffs, the trial court properly found that Skelly was in fact depleting its reserves more rapidly than Getty, that Getty was proportionately outspending Skelly

in the areas of exploration, development, and production, that Getty was more successful at finding oil, and that Getty's future prospects were superior. As to Skelly's exploration expenditure reductions, the evidence demonstrates that in large part, these reductions were due to Skelly's withdrawal from unprofitable oil and gas lease obligations. *See Levitt v. Bouvier,* Del. Supr., 287 A.2d 671, 673 (1972). With respect to the claimed dilution of earnings and dividends, these issues were raised in the negotiations, and the Getty team agreed to raise Getty's 1977 dividend to prevent dilution. The evidence of dilution presented by defendant and Delaware case law indicate that the alleged 26% earnings dilution did not taint the fairness of the merger ratio. *See Bastian v. Bourns, Inc.,* Del.Ch., 256 A.2d 680, 683–84 (1969), *aff'd,* Del.Supr., 278 A.2d 467 (1970) (in exchange merger, future prospects of survivor corporation and ready investor market outweighed earnings dilution); *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 436 (1968) (earnings dilution plus uncertainty of earnings multiplier and possible taking of a corporate opportunity warranted preliminary injunction of exchange merger).

After an exhaustive review of the facts and evidence relating to the issue of fairness, we conclude that Getty dealt fairly with Skelly's minority shareholders from the genesis of the merger through approval by the respective boards of the two companies. We also conclude that the price received by the Skelly shareholders was fair.

IV.

Turning to the propriety of the delegation of the subsurface asset valuation to D & M, we note that this action too is subject to the entire fairness standard. However, plaintiffs' argument, as we understand it, is that this was an impermissible act in the sense that it was an abdication of directorial responsibility. See *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 816 (1984); *Lutz v. Boas,* Del.Ch., 171 A.2d 381, 395, 396

(1961). Thus, unless it was a proper business decision in the first instance the ultimate question of fairness is moot.

■ An informed decision to delegate a task is as much an exercise of business judgment as any other. *Aronson v. Lewis*, 473 A.2d at 813. The realities of modern corporate life are such that directors cannot be expected to manage the day-to-day activities of a company. This is recognized by the provisions of 8 *Del.C.* § 141(a) that the business and affairs of a Delaware corporation are managed "by or under the direction" of its board. In setting its agenda as to the matters in which it will be directly involved, and those it will delegate, a board's decisions in those areas are entitled to equal consideration as exercises of business judgment. *Aronson v. Lewis*, 473 A.2d at 813. This principle seems to have been recognized, at least inferentially, in *Kelly & Wyndham, Inc. v. Bell*, Del.Supr., 266 A.2d 878, 879 (1970) and in *Graham v. Allis-Chalmers Manufacturing Co.*, Del. Supr., 188 A.2d 125, 130–31 (1963).

D & M is not a stranger to the courts of this State. *See Gimbel v. Signal Co., Inc.*, Del.Ch., 316 A.2d 599, 611 (1974) (D & M "a prominent independent firm of petroleum geologists"); *Fidanque v. American Maracaibo Co.*, Del.Ch., 92 A.2d 311, 320 (1952) (D & M "highly regarded in the oil appraisal field"). *See also Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1128 (4th Cir.1970) (D & M "among the most respected engineering firms engaged in supplying independent estimates of the worth of oil and gas properties"); *Del Noce v. Delyar Corp.*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,670, at 90,298 (S.D.N.Y.1976) (D & M "a highly respected independent appraiser of oil and gas reserves"); *Honaker Drlg., Inc. v. Koehler*, 190 F.Supp. 287, 295 (D.Kan.1960) (relying on D & M estimates report to hold closely-held corp. was not an IRC § 341(b) collapsible corporation). Moreover, the trial court found as a fact that D & M had an outstanding worldwide reputation as a petroleum engineering consultant. D & M has

valued Getty's reserves since 1939, and has done similar work with Skelly for several years. However, there is no proof that D & M lacked independence or was in any way beholden to either party. The record fully supports a conclusion that D & M had the requisite reputation and experience to assist Getty and Skelly.

Second, it is important to note why the delegation was made, and what task was actually delegated. In late October 1976, Getty and Skelly were unable to agree on future price schedules of oil and natural gas. D & M was to apply the future price schedules to the reserves estimates and thereby calculate several economic analyses which the parties would then discuss. Given their disagreements, the parties turned to D & M to select prices, costs, and risk factors and then make a final estimate of asset value. *Cf. Harriman v. E.I. DuPont de Nemours & Co.*, 411 F.Supp. 133, 148, 161 (D.Del.1975) (exchange merger parties jointly retained broker to appraise asset value of newspaper). At this point the parties had their negotiated surface asset values, D & M's reserve estimates, their own reserve estimates, and the preliminary economic analyses used by D & M. Furthermore, evidence shows that Skelly personnel, who considered the use of D & M to be to their advantage, did in fact double-check D & M's results. However, the parties did not delegate the weighting task under the Delaware Block method, nor did they bind themselves to merge in the first instance. *Compare Clarke Memorial College v. Monaghan Land Co.*, Del.Ch., 257 A.2d 234, 240–41 (1969); *Field v. Carlisle Corp.*, Del.Ch., 68 A.2d 817, 819–21 (1949). *Cf. Sterling*, 93 A.2d at 109, 110 (Haslam study "basis" and "principal justification" for merger). Rather, the parties in effect selected an independent appraiser to value subsurface assets. Coupled with the fact that this was done in the course of arm's length negotiations, a conclusion which this record amply supports, it is clear that each party acted independently in delegating the task to D & M. Those actions

meet the test of independence announced by us in *Aronson v. Lewis:*

> Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. While directors may confer, debate, and resolve their differences through compromise, or by reasonable reliance upon the expertise of their colleagues and other qualified persons, the end result, nonetheless, must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act. 473 A.2d at 816.

Accordingly, we conclude that the decision was a proper exercise of business judgment and meets the test of fairness.

## V.

Having examined the fairness of the merger, including the propriety of the delegation to D & M, we consider the plaintiffs' claim that the Skelly proxy statement does not satisfy the standards of *Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278, 281 (1977). In *Lynch,* this Court held that to ascertain whether certain individual directors and the majority shareholder, Vickers Energy Corporation, had met their duty of complete candor, "the limited function of the Court was to determine whether defendants had disclosed [to the minority shareholders] all information in their possession germane to the transaction in issue". *Id.* at 281. The *Lynch* court defined as germane, in a tender offer context, any information which a reasonable shareholder would consider important in deciding whether to sell or retain stock. *Id.* (ceiling price and ceiling asset value in tender offer held germane). *See Weinberger,* 457 A.2d at 709 (insiders' report that cash-out merger price up to $24 was good investment held germane); *Michelson v. Duncan,* Del. Supr., 407 A.2d 211, 222 (1979) (alleged terms and intent of stock option plan held not germane); *Schreiber v. Pennzoil Co.,* Del.Ch., 419 A.2d 952, 958–59 (1980) (management fee of $650,000 held germane). *Cf. Kaplan v. Goldsamt,* Del.Ch., 380 A.2d 556, 561 (1977). The court in *Lynch* also stated that disclosure of *all* germane facts was required. *Lynch,* 383 A.2d at 281.

Recently, in *Smith v. Van Gorkom,* Del. Supr., 488 A.2d 858, 890 (1985), we noted that "germane" means "material" facts. The term "germane" has no well accepted meaning in the disclosure context, while "material" does. Moreover, it is clear from the Delaware cases that the materiality standard of *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), applies. *See Field v. Allyn,* Del.Ch., 457 A.2d 1089, 1100, *aff'd,* 467 A.2d 1274 (1983); *Kaplan v. Goldsamt,* Del.Ch., 380 A.2d 556, 565–66 (1977).

As stated by the Supreme Court of the United States, that standard is:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* [*v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. 426 U.S. at 449, 96 S.Ct. 2132. (emphasis in original)

Even the seminal case of *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977), employing the term "germane" for the first time, relied upon this concept of materiality by citing *TSC Industries, Inc. v. Northway, Inc.* in support of its reasoning. *See Lynch*, 383 A.2d at 281.

Plaintiffs claim that the Skelly proxy statement failed to disclose the D & M delegation and the parties' understanding that D & M's methods were to remain secret. In particular, plaintiffs point to language in the proxy statement indicating that the investment bankers "examined" the "reports" and "estimates and valuations" made by D & M. Plaintiffs argue that this language falsely implied that Blyth Eastman and Smith Barney had actual knowledge of D & M's methods and calculations, thereby influencing Skelly's minority to vote to approve the merger. Plaintiffs also argue that the proxy statement masked the delegation of the subsurface asset valuation to D & M.

■ Applying the *TSC Industries, Inc.* analysis, we conclude that Skelly fully met its duty of complete candor. *See TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132. In particular, we conclude that in deciding whether to vote to approve the merger, a reasonable shareholder would not consider the delegation to D & M or the confidentiality of its methods to be material. *See id.* The proxy statement listed, as the basis for the exchange ratio, negotiations and relative asset values, market prices, and earnings records. These materials acknowledged that "[p]etroleum and other mineral reserves were estimated by DeGolyer and MacNaughton, independent consulting engineers...." Thus, we are satisfied that a reasonable shareholder would know that D & M alone estimated subsurface reserves, and that D & M's task went to a part of one of the three factors comprising the exchange ratio. We seriously doubt that a reasonable shareholder would consider the delegation to or the secrecy understanding with D & M to have significantly altered the "total mix" of in-

formation made available. *See TSC Industries, Inc. v. Northway*, 446 U.S. at 449, 96 S.Ct. at 2132.

■ Assuming *arguendo* that these two facts were material, the proxy statement disclosed them to the shareholders. First, it disclosed that Smith Barney examined estimates of the three companies' "relative asset values (other than those assets evaluated by DeGolyer and MacNaughton) ... and estimates and valuations of the oil and gas and mineral reserves of [the companies] by the DeGolyer and MacNaughton". The proxy then referred to the attached opinions of Blyth Eastman and Smith Barney. The Smith Barney opinion stated that:

> [w]e have also been *furnished* by DeGolyer and MacNaughton ... reserve estimates ... and the *results* of calculations of values for these reserves.... We have also been *furnished* the valuation of the reserves prepared by [DeGolyer and MacNaughton] ... and have been advised that the D & M Values ... are *final and accepted* by Skelly, Mission, and Getty respectively. (emphasis added).

The Smith Barney opinion also stated that "[w]e have been consulted by Skelly in the preparation of and have been furnished estimates, agreed to by the respective companies, of the relative values attributable to the assets of Skelly, Mission, and Getty (*other* than those assets evaluated by D & M)...." (emphasis added). The Blyth Eastman opinion is to the same effect. Given these attachments to the proxy, we conclude that the duty of complete candor was met.

## VI.

After careful scrutiny of the entire transaction, we conclude that Getty dealt fairly with the Skelly minority shareholders in the merger. In our opinion the exchange ratio ultimately agreed upon was entirely fair as the product of a careful evaluation of all relevant factors and arm's length bargaining. In so finding, we deem the

delegation of certain valuation tasks to D & M to be entirely valid. We view the proxy statement issued by Skelly to fully satisfy the standards of Delaware law. Accordingly, we affirm the decision of the Chancellor.

∗   ∗   ∗

AFFIRMED.