# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ADAM GRABSKI, derivatively on behalf of COINBASE GLOBAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MARC ANDREESSEN, BRIAN ARMSTRONG, SUROJIT CHATTERJEE, EMILIE CHOI, FREDERICK ERNEST EHRSAM III, ALESIA J. HAAS, KATHRYN HAUN, JENNIFER JONES, and FRED WILSON,<br><br>Defendants, and<br><br>COINBASE GLOBAL, INC.,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2023-0464-KSJM |

## MEMORANDUM OPINION

Date Submitted: October 16, 2023
Date Decided: February 1, 2024

Gregory V. Varallo, Mae Oberste, Daniel Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Edward G. Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Robert E. Bishop, Frank Partnoy, BISHOP PARTNOY LLP, Washington, District of Columbia; Brian Schall, THE SCHALL LAW FIRM, Los Angeles, California; *Counsel for Plaintiff Adam Grabski.*

David E. Ross, Adam D. Gold, S. Reiko Rogozen, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Andrew Clubok, LATHAM & WATKINS LLP, Washington, District of Columbia; Matthew Rawlinson, LATHAM & WATKINS LLP, Menlo Park, California; Morgan E. Whitworth, LATHAM & WATKINS LLP, San Francisco, California; *Counsel for Individual Defendants Marc Andreessen, Brian Armstrong, Surojit Chatterjee, Emilie Choi, Federick Ernest Ehrsam III, Alesia J. Hass, Kathryn Haun, Jennifer Hones, Fred Wilson, and Nominal Defendant Coinbase Global, Inc.*

**McCORMICK, C.**

Cryptocurrency platform Coinbase Global, Inc. went public through a direct listing. The defendants were directors and officers of Coinbase and sold $2.9 billion worth of stock in the direct listing. A month later, the company announced disappointing quarterly earnings and that it was raising capital through a notes offering. After this announcement, the company's stock price declined precipitously. By selling their shares before the announcement, the defendants avoided losses of approximately $1.09 billion. The plaintiff, who acquired Coinbase stock through the direct listing, filed this derivative suit alleging that the defendants sold their stock based on material non-public information and were unjustly enriched by the sales.

The defendants have moved to dismiss the complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6). They argue that the plaintiff has failed to plead facts sufficient to impugn the impartiality of the company's board for purposes of Rule 23.1. They further argue that the plaintiff has failed to adequately allege that the defendants had material non-public information and possessed the requisite scienter when selling their shares for purposes of Rule 12(b)(6).

Although the defendants' briefs read like a philosophical apology for direct listings, the plaintiff's claims do not place that relatively nascent transactional structure on the chopping block. Rather, this is yet another instance where a stockholder plaintiff calls on this court to deploy "well-worn fiduciary principles" to a new transactional setting.[1] Applying those principles and drawing the plaintiff-

---

[1] *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 792 (Del. Ch. 2022) (applying well-worn fiduciary principles in the SPAC context).

friendly inferences called for at this stage of the litigation, the court concludes that plaintiff has met the demand requirement and stated a well-pled claim. The motions are denied.

## I.     FACTUAL BACKGROUND

The facts are drawn from the Verified Stockholder Derivative Complaint (the "Complaint") and documents it incorporates by reference.[2]

### A.     Coinbase

Founded in 2012 by defendants Brian Armstrong and Frederick Ernest Ehrsam III, Coinbase is a Delaware corporation that owns and operates the largest cryptocurrency trading platform in the United States by trading volume. Coinbase was privately held until 2021, when it was directly listed on the Nasdaq exchange.

Over 90% of Coinbase's revenue derives from brokerage fees. Before the direct listing, the brokerage fee landscape was changing. Market analysts and research firms had highlighted the importance of retail fees to Coinbase's business model and cautioned about the industry's sensitivity to changes in brokerage fees. In early 2021, the Coinbase Board of Directors (the "Board") and its senior management considered the sustainability of Coinbase's fee revenues in the face of industry-wide "fee compression"[3] and learned that customers and corresponding fee revenues were moving away from the Coinbase retail platform.

---

[2] C.A. No. 2023-0464-KSJM, Docket ("Dkt.") 1 ("Compl.").

[3] *Id.* ¶ 81.

Also at that time, Coinbase was reviewing various capital raising options. Before the direct listing, the Board had studied projections on Coinbase's liquidity situation and sensitivity in shock situations.

### B. Events Leading To The Direct Listing

The Board met on August 4, 2020, to discuss taking Coinbase public. A slide deck presented to the Board listed the following among the Board's objectives: "liquidity (first to employees, then to existing investors)" and "no dilution."[4] Of the two paths to going public discussed by the Board—a traditional initial public offering ("IPO") or a direct listing—the Board viewed the direct listing as best suited to achieve its liquidity and anti-dilution goals. The Board therefore approved pursuing a direct listing. In October 2020, Coinbase filed a confidential registration statement on its Form S-1 with the SEC indicating its intent to go public by a direct listing without raising any capital (the "Registration Statement").

#### 1. Overview Of Direct Listings

Through an IPO, a company sells a portion of its shares to one or more underwriters who, in turn, make the offering with their own capital. The underwriters' role in an IPO has at least two important consequences. First, the underwriters perform diligence before the transaction, which serves as a check on management. Second, underwriters typically require the company to implement a lock-up period for its directors and officers to prevent misuse of insider information.[5]

---

[4] *Id.* ¶ 40.

[5] *Id.* ¶¶ 32, 35.

Unlike an IPO, a direct listing involves the sale of existing company shares directly to the public. No new shares are required, and no underwriters are involved. Instead, the public purchases the shares held by the company's existing stockholders, who typically include directors and officers. The offering company has the option—but is not required—to implement safeguards to protect investors.

Direct listings have increased in popularity since Spotify's listing in 2018.[6] Although a direct listing is cheaper and faster than an IPO, a direct listing's limited disclosure requirements, lack of underwriter diligence, and optional investor safeguards has raised scholarly concern.[7]

The initial price in a direct listing, called the "reference price," is determined by the listing company with the help of accountants and other professionals.[8] To determine this price, Nasdaq requires the listing company to provide certain information. Companies often hire investment bankers to run a mini-exchange—a secondary trading program—to gauge the public perception of the company's value. When setting the reference price, considerations include the company's public financial information, previous private market valuations, value of competitors, and

---

[6] *See* Andrew F. Touch & Joel Seligman*, The Further Erosion of Investor Protection Expanded Exemptions, SPAC Mergers, and Direct Listings,* 108 Iowa L. Rev. 303, 356 (2022) (describing the 13 direct listings between 2018 and 2022 in the United States).

[7] *See, e.g.,* Brent J. Horton, *Spotify's Direct Listing: Is it a Recipe for Gatekeeper Failure?*, 72 SMU L. Rev. 177, 203–06 (2019) (outlining the reputational, contractual, and statutory pressures that underwriters face as "gatekeepers" of investor protection).

[8] Compl. ¶¶ 6, 8, 40–51.

internal discounted cash flow valuations. Nasdaq works in concert with the company's financial advisor to determine the reference price.

### 2. The Secondary Trading Program

On November 13, 2020, the Board and Coinbase management met to discuss running a secondary trading program (the "Secondary Trading Program") that would facilitate price discovery to set the reference price for the direct listing. The program launched on January 7, 2021. The Board prohibited directors and officers from participating in the secondary trading program due to the risk of material information asymmetry between insiders and market participations.

### 3. Board Approval

On December 11, 2020, the Board, alongside Coinbase's senior officers, met to discuss initial feedback on Coinbase's registration statement with the SEC. During this meeting, the Board discussed "potential capital raising opportunities and structures."[9] The Board considered the option of a modified IPO instead of a direct listing. The Board's objectives were to "minimize dilution and cost of issuance (i.e., banker's fees and discount)."[10] The Board discussed issuing convertible notes but decided to deprioritize an issuance until "the right time."[11] Coinbase continued to work toward a direct listing.

---

[9] *Id.* ¶ 55.

[10] *Id.* ¶ 57.

[11] *Id.* ¶ 56.

On February 23, 2021, the Board and senior officers met to finalize the direct listing. The Board learned that the "executive team [was] aligned on no lockups for all stockholders (investors and employees)."[12]

On March 26, 2021, the Board approved a direct listing (the "Direct Listing"). The Board did not impose a lock-up period on insiders.

### 4. The Andersen Report

Coinbase hired Andersen Tax LLC to prepare valuation reports in connection with Section 409A regulations of the Internal Revenue Code, as well as prepare the Financial Accounting Standards Board Accounting Standards Codification Topic 718 – Compensation.

Using a valuation date of March 15, 2021, Andersen issued a report (the "Andersen Report") determining that Coinbase's fair value was $303.75 per share (the "Andersen Valuation"). The Andersen Valuation gave 50% weight to the average stock price that emerged out of the Secondary Trading Program, which was $343.58 per share, and 50% weight to the value produced under the weighted expected return method ("PWERM"), which was $263.90 per share. The PWERM method involved "the estimation of future potential outcomes for the company, as well as values and probabilities associated with each respective potential outcome."[13]

Andersen also conducted a discounted cash flow analysis based on management's projections to arrive at a value of Coinbase that was lower than the

---

[12] *Id.* ¶ 87.

[13] *Id.* ¶ 93.

value implied by the per-share price of the secondary trading program and the PWERM.

The Board approved the Andersen Report on March 26, 2021.

### 5. Q1 Results And Guidance

In its April 6, 2021 guidance on earnings, Coinbase announced its first quarter results and provided investors full year guidance on users, revenue, and expenses. Coinbase did not disclose information concerning fee compression or potential liquidity struggles. In response to the release, Compass Point, a research firm, noted that the "somewhat limited financial information" in the guidance (such as the lack of a breakdown in total revenues) and "inherent volatility of cryptocurrency" made it difficult to analyze the value of the Company.[14]

### 6. The Direct Listing

On April 13, 2021, Nasdaq set Coinbase's reference price at $250 per share. The next day, Coinbase became a Nasdaq-listed company, and its stock opened at $380, rising to as high as $429 on the first day of trading.

Not constrained by a lock-up period, the members of Coinbase's board and its senior officers sold Coinbase stock worth $2.9 billion. Thirteen of the eighteen sales were completed by April 15, 2021. The only board member or officer who sold after April 15 was Fred Ehrsam, whose last sale was on April 22, 2021.

---

[14] *Id.* ¶ 102.

## C. Events After The Direct Listing

By April 23, 2021, Coinbase's stock price had fallen to a range of $282.75 to $291.60 per share. During an April 28, 2021 meeting, the Board approved the issuance and sale of up to $2 billion of convertible notes. The objective of the notes offering was "to build [a] balance sheet for working capital and acquisition capacity[.]"[15]

Two weeks after the Direct Listing, the Board reviewed Coinbase's pricing strategy and fee compression issues affecting peer companies.[16] A slide from that presentation noted the "inevitability of fee compression" in the crypto industry.[17] The Board also reviewed some initiatives under consideration to blunt the blow of fee compression to Coinbase's revenues.

On May 13, 2021, Coinbase announced that its retail transaction fee rate had fallen. Analysts noted that the fee rate was "largely driven by retail mix shift towards Coinbase Pro which has tiered pricing."[18] Coinbase's stock dropped 2.54% on the day of the earnings release.

Coinbase announced the notes offering on May 17, 2021. The offering was met with market curiosity because Coinbase was "generat[ing] positive cash flow, [wa]s

---

[15] *Id.* ¶¶ 109–12.

[16] *Id.* ¶¶ 81–83.

[17] *Id.*

[18] *Id.* ¶ 124.

8

growing rapidly," and had just completed the Direct Listing.[19]  Within minutes of the issuance, Coinbase's stock dropped 2.9%.

### D.    This Litigation

Plaintiff Adam Grabski ("Plaintiff") bought Coinbase stock on the first day of the Direct Listing.  He filed this action on April 26, 2023, asserting claims for breach of fiduciary duty (Count I) and unjust enrichment (Count II) against the five Coinbase directors (the "Director Defendants") and four Coinbase officers (the "Officer Defendants") (together, with the Director Defendants, "Defendants") who sold stock in the Direct Listing.  The Director Defendants are Marc Andreessen, Ehrsam, Brian Armstrong, Kathryn Haun, and Fred Wilson.  The Officer Defendants are Emilie Choi (Chief Operating Officer), Alesia Haas (Chief Financial Officer), Jennifer Jones (Chief Accounting Officer), and Surojit Chatterjee (Chief Product Officer).

At the time Plaintiff filed this action, the Board (the "Demand Board") comprised Armstrong, Andreessen, Ehrsam, Haun, Wilson, Kelly Kramer, Gokul Rajaram, and Tobias Lutke.  All but Lutke were members of the Board at the time of the Direct Listing.

On June 30, 2023, Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6), and the parties completed briefing on September 27, 2023.[20]  The court held oral argument on October 16, 2023.

---

[19] *Id.* ¶ 129.

[20] Dkt. 15 ("Defs.' Opening Br."); Dkt. 23 ("Pl.'s Answering Br."); Dkt. 25 ("Defs.' Reply Br.").

## II. LEGAL ANALYSIS

This analysis first addresses the dismissal arguments concerning Count I for breach of fiduciary duty and then turns to the arguments concerning Count II for unjust enrichment.

### A. The Fiduciary Duty Claims

In Count I, Plaintiff claims under *Brophy v. Cities Service Co.*[21] that the Defendants breached their fiduciary duties by improperly selling their shares through the Direct Listing while in possession of material, nonpublic company information ("MNPI").

Defendants have moved to dismiss Count I under Rule 12(b)(6). The Rule 12(b)(6) standard in Delaware "is reasonable 'conceivability.'"[22] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[23] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[24]

---

[21] 70 A.2d 5 (Del. Ch. 1949).

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[23] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[24] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

Defendants have also moved to dismiss Count I under Rule 23.1. A *Brophy* claim is derivative in nature "because it arises out of the misuse of corporate property—that is, confidential information—by a fiduciary of the corporation, for the benefit of the fiduciary and to the detriment of the corporation."[25] As a derivative claim, Count I is subject to the demand requirement.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[26] "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[27] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause

---

[25] *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at \*6 (Del. Ch. July 24, 2009).

[26] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253–54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

[27] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (2021).

of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[28]  The demand requirement is a substantive principle under Delaware law.[29]

Rule 23.1 is the "procedural embodiment" of the demand requirement.[30]  Under Rule 23.1, a derivative complaint must "state with particularity: . . . any effort by the derivative plaintiff to obtain the desired action from the entity; and . . . the reasons for not obtaining the action or not making the effort[.]"[31]

A stockholders can satisfy the demand requirement by pleading that demand is futile.  To plead demand futility, the complaint must allege "particularized factual statements that are essential to the claim."[32]  Although the requirement of factual particularity is a heightened pleading requirement, it "does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations."[33]  If a plaintiff pleads particularized facts, those factual allegations "are accepted as true" and "[p]laintiffs

---

[28] *Id.*

[29] *Id.*; *see* Ct. Ch. R. 23.1(a).

[30] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[31] Ct. Ch. R. 23.1(a)(1) (as amended Sept. 25, 2023).

[32] *Brehm*, 746 A.2d at 254.

[33] *Zuckerberg*, 250 A.3d at 877 (citing cases).

are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged[.]"[34]

In *Zuckerberg*, the Delaware Supreme Court adopted Vice Chancellor Laster's "universal test" for demand futility that blends elements of the two precursor tests: *Aronson*[35] and *Rales*.[36] When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[37]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[38] Although the *Zuckerberg*

---

[34] *Id.* (citing cases).

[35] 473 A.2d 805.

[36] 634 A.2d 927.

[37] *Zuckerberg*, 262 A.3d at 1059 (quoting *Zuckerberg*, 250 A.3d at 890).

[38] *Id.*

13

test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[39]

When Plaintiff initiated this action, the Demand Board comprised eight directors. So, to adequately allege demand futility, Plaintiff must plead particularized facts creating reason to doubt that at least four of the eight were incapable of impartially considering a demand.[40] Plaintiff argues that the five Director Defendants (Andreeseen, Armstrong, Ehrsam, Haun, and Wilson) on the Demand Board were incapable of impartially considering a demand.

Plaintiff advances arguments under the first and second prongs of *Zuckerberg*. Plaintiff argues that the Director Defendants are interested because they received material personal benefits when they sold stock worth billions of dollars in the Direct Listing. Plaintiff also argues that the Director Defendants face a substantial likelihood of liability based on the *Brophy* claims.

The analysis of Count I proceeds in three parts. First, the court addresses the argument that the Director Defendants are interested under *Zuckerberg* because they received material personal benefits.

---

[39] *Id.* In 2023, the Court of Chancery amended its rules to reflect the Delaware Supreme Court's adoption of the *Zuckerberg* test and modernize the language and presentation of the Rules to bring them closer in style to the Federal Rules of Civil Procedure. *See In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).

[40] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989–90 (Del. Ch. 2007) ("Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.").

14

Second, the court addresses the Director Defendants face a substantial likelihood of liability based on the *Brophy* claims. Because showing that a defendant faces a substantial likelihood of liability from a claim requires that the claim be legally viable, as to the Director Defendants, the Rule 23.1 analysis effectively folds into the Rule 12(b)(6) analysis.

Third, the court turns to Count I against the Officer Defendants, which largely overlaps with that of the Director Defendants. There is one point of divergence: The factual bases for the *Brophy* claim against the Officers Defendants are slightly from those alleged against the Director Defendants.

### 1. Material Personal Benefit

A director is disabled for demand futility purposes if they received a material personal benefit from the wrongdoing that was not shared equally with the stockholders.[41] Whether a benefit is material is a question of fact that takes into consideration the amount, the recipient's wealth, and the circumstances surrounding the benefit.

Plaintiff alleges with particularity the details of the Director Defendants' (and Officer Defendants') trades, including the dates, number of shares, and amounts sold.[42] The sales were for staggering amounts. $52 million for Haun, $ 61 million for Chatterjee, $99 million for Haas, $118 million for Andreessen, $219 million for Ehrsam, $223 million for Choi, $291 million for Armstrong, $1.8 billion for Wilson,

---

[41] *Zuckerberg*, 262 A.3d at 1058; *Rales*, 634 A.2d at 936.

[42] Compl. ¶ 106.

and a paltry $43 million for Jones.[43]   These sales resulted in benefits to the Defendants totaling almost $2.93 billion, with no Director Defendant receiving less than $50 million.

Plaintiff argues that it is reasonably conceivable that this amount of money was material to each Director Defendant such that none could impartially consider a pre-suit litigation demand attacking the sales.  Plaintiff need not allege facts concerning each Director Defendant's personal wealth to support this conclusion—$50 million is presumptively material.[44]

Defendants advance three arguments in response.  They first argue that Plaintiff waived his ability to make arguments concerning the Director Defendants' material personal benefits because he failed to adequately plead this legal theory in his Complaint.[45]  Impliedly, the Director Defendants argue that Rule 23.1 requires that a stockholder plaintiff plead their legal theories with particularity.  But that is not how Rule 23.1 works.  Rather, Rule 23.1 requires that a derivative complaint plead facts with particularity.  Plaintiff did so here.  At the pleadings stage, drawing all inferences from the particularized facts in Plaintiffs' favor, it is reasonably

---

[43] *Id.* (approximate figures).

[44] *See MultiPlan*, 268 A.3d at 813 ("A greater than half-million-dollar payout is presumptively material at the motion to dismiss stage."); *Orman v. Cullman*, 794 A.2d 5, 31 (Del. Ch. 2002) ("I think it would be naïve to say, as a matter of law, that $3.3 million is immaterial.").

[45] Defs.' Reply Br. at 31.

conceivable that the Director Defendants received a material personal benefit that would compromise their impartiality in considering demand.[46]

Defendants next argue that Plaintiff's materiality arguments boil down to a collateral attack on the Board's decision to structure the Direct Listing without a lock-up. From this premise, Defendants argue that Plaintiff lacks standing to challenge the Board's decision on how to structure the Direct Listing because Plaintiff was not a stockholder at the time that the Board made that decision.[47] But Plaintiff's materiality argument is not based—necessarily or actually—on the decision on how to structure the Direct Listing. Rather, Plaintiff challenges the Defendants' sales made in that listing.

Defendants' last argument is that selling stock cannot give rise to a "personal benefit," for the purpose of demand futility on a *Brophy* claim.[48] For this proposition, Defendants rely on *Guttman v. Huang*.[49] There, the plaintiff brought a *Brophy* claim against the officers and directors of NVIDIA who sold a total of $194.6 million worth of company stock over two years.[50] During that period, the defendants were allegedly aware of accounting irregularities that inflated the company's trading price and,

---

[46] *In re Carvana Co. S'holders Litig.*, 2022 WL 2352457, at *18 (Del. Ch. June 30, 2022) (holding same at pleadings stage in entire fairness context where a director may have avoided the same level of dilution as public stockholders before a direct offering).

[47] Defs.' Reply Br. at 31–33.

[48] Defs.' Opening Br. at 36–37; Defs.' Reply Br. at 32–33.

[49] 823 A.2d 492 (Del. Ch. 2013).

[50] *Id*. at 493.

17

ultimately, caused the company to restate its financials.[51]  The defendants moved to dismiss the complaint under Rule 23.1.  The plaintiffs argued that demand was futile because each of the demand board members traded stock during the relevant period.  The court rejected this argument, holding that selling stock in the market at a time while in possession of MNPI did not give rise to a personal interest for demand futility purposes.[52]

In reaching this conclusion, the *Guttman* court did not deny that, in the real world, stock sales can provide a material personal benefit to directors.  Rather, the court based its holding on policy grounds.  The court reasoned that it would be "unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information."[53]  The court concluded that such a rule would create a "hair-trigger demand excusal" inconsistent with the purpose of the demand requirement.[54]  To avoid setting a bar for demand futility too low, the court held that a plaintiff must demonstrate that the director had a substantial likelihood of liability.

Defendants characterize the court's holding in *Guttman* as a categorical rejection of "the notion that directors have a disabling 'personal interest' based on

---

[51] *Id.* at 497.

[52] *Id.* at 502.

[53] *Id.*

[54] *Id.*

stock sales alone."[55] And that is one fair reading of the case. But Defendants' reading improperly detaches the *Guttman* court's holdings from the case-specific concerns. Throughout *Guttman*, the court repeatedly emphasized that the plaintiff's allegations were "cursory."[56] The court, therefore, could have probably allayed the "hair-trigger" concern by deeming the stock sales a material personal benefit and then running the Rule 12(b)(6) analysis, under which the cursorily alleged MNPI and scienter elements would have failed.

In all events, *Guttman* did not require that this court ignore basic aspects of human nature when evaluating whether a director received a material personal benefit. Just as it would be "unwise" to say that a director *always* materially benefits

---

[55] Defs.' Reply Br. at 33 (citing *Guttman*, 823 A.2d at 502.).

[56] *Guttman,* 823 A.2d at 493–94 ("[w]hen the case most cries out for the pleading of real facts—e.g., about the board's knowledge of the accounting problems at the company or the company's audit committee process—the complaint is at its most cursory'"); *id.* at 495 (noting "[u]nhelpfully, the complaint fails to detail specifically the net result of [the financial] restatements" and asserting that the omission appeared "tactical[]" so as to "leav[e] the court without a way to assess the magnitude of the corrections"); *id.* at 498 (noting "[t]he complaint is entirely devoid of particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of the accounting improprieties"); *id.* at 498 (noting "the complaint is devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements"); *id.* at 498 (noting the complaint does not include information concerning "[t]he actual trading patterns of the defendants—particularly the outside directors—during the periods preceding the Contested Period, or the relationship of their trades to options vesting periods, or to the end of restrictions on marketability that may have been imposed when NVIDIA first went public"); *id.* at 504 ("The cursory allegations of the complaint in this action do not come close to meeting the plaintiffs' burden to show that these five defendants face a substantial threat of liability for insider trading-based fiduciary duty violations. Nothing in the complaint provides any particularized basis to infer that these outside directors had any idea about the questionable accounting practices. This is fatal to the plaintiffs' effort to show demand excusal.").

19

under *Zuckerberg* when she sells company stock, it would be unwise to say a director *never* materially benefits under *Zuckerberg* even if she receives a gargantuan financial benefit. In the real world, the billions of dollars made by the Director Defendants constitutes a material personal benefit that would render a director incapable of impartially considering a demand attacking those sales. Demand is excused on this basis.

### 2. Substantial Likelihood Of Liability

Even if *Guttman* is read to categorically foreclose the possibility that a director can receive a material personal benefit for demand futility purposes from the sale of stock, Plaintiff has satisfied the demand requirement because the Director Defendants face a substantial likelihood of liability based on the *Brophy* claims.

To state a claim under *Brophy*, a plaintiff must plead that the defendants: (a) possessed MNPI; and (b) used that information to make trades because the defendants were motivated by the substance of that information (the scienter requirement).[57] To plead a substantial likelihood of liability, a plaintiff must "make a threshold showing, through the allegation of particularized facts, that their claims have some merit."[58] At the pleading stage, a *Brophy* claim "rests on circumstantial facts and a successful claim typically includes allegations of unusually large,

---

[57] *In re Oracle, Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004); *see also Guttman*, 823 A.2d at 505.

[58] *Rales*, 634 A.2d at 934.

20

suspiciously timed trades that allow a reasonable inference of scienter."[59]  Plaintiff

has made the threshold showing as to both elements.

### a.    Possession Of MNPI

Plaintiff alleges that the Director Defendants possessed four categories of

MNPI prior to the Direct Listing.[60]  Given that only one category must be pled, the

court will restrict the analysis to one—the Andersen Report.  Plaintiff claims that the

Director Defendants knew that the Andersen Report valued the Company's stock well

below its trading price when they sold into the Direct Listing.

Plaintiff has pled knowledge.  Plaintiff alleges that the Board (containing the

Director Defendants) approved the Andersen Report by unanimous written consent

on March 26, 2021.[61]  From this, the court can infer that the Director Defendants had

knowledge of the contents of the Andersen Report.

Plaintiff has pled that the Andersen Report was not public.  It was not disclosed

in the Registration Statement, the Q1 2021 pre-earnings release materials, or any

other public source.  Defendants concede that the Andersen Report was non-public

because they consistently redacted its price out of the public versions of the

Complaint until after oral argument.[62]

---

[59] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at \*15 (Del. Ch. Oct. 1, 2019) (quoting *Oracle*, 867 A.2d at 954).

[60] Plaintiff argues that the following categories constituted MNPI in Defendants' possession: (i) the Andersen Valuation; (ii) information on Coinbase's future performance after the Direct Listing; (iii) information on Coinbase's cash struggles; and (iv) information on fee compression.

[61] Compl. ¶ 91.

[62] Dkt. 35.

Plaintiff has pled that the information in the Andersen Report was material. "For information to be material, there must be a 'substantial likelihood' that the nonpublic fact 'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or tender stock."[63] If the information were disclosed, it would "significantly alter[] the 'total mix' of information in the marketplace."[64] In determining materiality, the court will consider the context and reliability of the information, including whether the information was known to the market.[65]

The Andersen Report determined that the fair value of the Company's stock was $303.75.[66] This figure was the weighted average of the trading price of Coinbase stock in the Secondary Trading Program ($343.58) and a probability-based figure determined by Andersen ($263.90).[67] Moreover, each Director Defendant knew that, using the management projections, Andersen's DCF analysis arrived at a valuation of Coinbase of $50.025 billion, which was below the total equity value implied by Andersen's per-share analysis. It was the Secondary Trading Program valuation of $343.58—set by buyers who had the same informational disadvantage as the rest of the market—that pushed the Andersen Valuation to $303.75 per share. The $303.75

---

[63] *Oracle*, 867 A.2d at 934 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.* ¶¶ 93–96.

valuation, DCF analysis, and underlying management projections concerning the value of Coinbase would have had actual significance to persons who purchased stock from Defendants in the Direct Listing in the $300s and $400s.[68]

Defendants argue that the Andersen Report should not be considered material for three reasons. First, there is no caselaw citing a 409A valuation as material in this or analogous contexts.[69] Second, Andersen provided Coinbase with eight valuation reports leading up to the Direct Listing, and each valuation was higher than the one before.[70] Third, the Board would have considered the prices in the Secondary Trading Program, which were disclosed to the market, more reliable than the 409A valuation, and they question the report's reliability generally.[71]

Defendants' arguments can be disposed of quickly. First, the lack of caselaw concerning the 409A valuation is not dispositive of anything; this court encounters new issues and new arguments with some frequency. Nor does the conclusion that it is reasonably conceivable that the Andersen Report was MNPI render all 409A valuations MNPI. The court has reviewed the contents of the Andersen Report. The contents and its timing in relation to the Direct Listing inform the court's conclusion. Second, the fact that there were many valuations prior to the Andersen Report does

---

[68] *See generally Silverberg v. Gold*, 2013 WL 6859282, at *10 (Del. Ch. Dec. 31, 2013) (noting that information is material if there is "a substantial likelihood that the nonpublic fact would have assumed actual significance in the deliberations of a person deciding whether to buy, sell, vote, or tender stock").

[69] Defs.' Reply Br. at 2, 10.

[70] *Id.* at 10–11.

[71] *Id.* at 10–12.

not diminish the materiality of the one closest to the timing of the Direct Listing. Third, Defendants' arguments attacking the reliability of the report invites the sort of defendant-friendly inference that is inappropriate at the pleadings stage.

### b. Scienter

To state a claim under *Brophy*, a plaintiff must allege that not only the fiduciary possessed material, nonpublic company information, but also that "the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."[72]

This court considers a variety of factors when evaluating whether a plaintiff has adequately alleged the scienter necessary to support a *Brophy* claim. "[A]llegations of unusually large, suspiciously timed trades"[73] are informative. Those allegations generally include:

- the timing of the trade, including the proximity between the trade and the time the defendants learn of MNPI,[74] and the expiration date for any options or restrictions (like lock-ups);[75]

- the size of the trade relative to the defendant's overall stock holdings;[76] and

- the size of the trades and the type of compensation (cash or shares).[77]

The court considers all these factors in their totality.

---

[72] *Oracle*, 867 A.2d at 934.

[73] *Clovis*, 2019 WL 4850188 at *15.

[74] *Id.*

[75] *Guttman*, 823 A.2d at 504.

[76] *Id.*

[77] *Id.*

24

Plaintiff has adequately alleged scienter. Plaintiff pleads facts concerning: the timing of the trades; the size of the trades—above $40 million in the aggregate; the amount of "each sale by each individual defendant";[78] the lack of a lock-up as compared to the secondary trading program; the fact that management recommended no lock-up; the lack of time between the valuation and the trading; and that the Defendants received cash instead of options or some other renumeration.[79] These facts are sufficient to support an inference that the Director Defendants were motivated by the substance of the MNPI.

Defendants advance two arguments in response. First, they cite Delaware cases for the proposition that the Director Defendants must have sold a larger proportion of their holdings to give rise to a pleadings-stage inference of scienter.[80] Second, they argue that the Director Defendants lacked scienter because they could have made more money by selling more stock after the initial sales but did not.

As to the first point, the portion of shares sold can speak to the reasonableness of inferring scienter, but it is not the litmus test that the Director Defendants

[78] *Id.* at 505.

[79] There are competing inferences for why Defendants sold their stock right after the Direct Listing opened. A defendant-friendly one is that Defendants were motivated to rapidly create a liquid market for Coinbase. An alternative plaintiff-friendly inference is that Defendants were selling quickly to make a profit. At this stage of the litigation, the court must draw all inferences in favor of Plaintiff.

[80] Defs.' Opening Br. at 32–33 (citing *Oracle*, 867 A.2d at 955; *TrueCar*, 2020 WL 5816761, at *25; *Clovis*, 2019 WL 4850188, at *15; *Guttman*, 823 A.2d at 503–04).

describe.[81]  To determine whether there is a reasonable inference of scienter, this court considers the totality of facts alleged, including the timing and size, not just the proportion of the sale to overall holdings.  In *In re Clovis Oncology*, for example, the court did not infer scienter where the sales were made well before (half a year) the alleged MNPI was disclosed to the market, there were no deviations from past trading practices, and the sales were for a total of only $4 million, representing a small portion of each defendant's overall holdings.[82]  By contrast, here, the sales were made as soon as weeks before Coinbase's earnings showed that the company was not doing as well as the market originally anticipated.  Further, Defendants sold $2.93 billion to avoid over $1.09 billion in losses.[83]  The totality of circumstances in this case support a pleadings-stage inference of scienter.

---

[81] *Clovis*, 2019 WL 4850188, at *15 (noting that the "size of trade relative" to an overall holding is a "piece" of evidence to be considered "along with timing" in a scienter determination).

[82] *Id.* at *8, *16.  The largest sale in *Clovis* was $2.79 million (approximately).  The percentage holdings for three defendants ranged from .1% to 4%, and the other defendant sold 10%.  *Id.* at *16.

[83] The other cases cited by Defendants similarly involved other factors, not present here, which contributed to the court's conclusion regarding scienter.  *See Guttman*, 823 A.2d at 498–99 (granting a motion to dismiss where the complaint did not allege numerous categories of "consequential" information, including trading patterns of defendants, an explanation for why the trades seem random, and whether the defendants had reason to know that the information was inaccurate); *Oracle*, 867 A.2d at 953 (granting summary judgment where the defendants had non-suspicious trading patterns and motivations, such as avoiding excessive tax liability); *TrueCar,* 2020 WL 5816761, at *25–26 (granting motion to dismiss where plaintiffs had not pled suspicious patterns of trading, "deviations from . . . past trading practices[,]" or that a defendant knew of the MNPI until after the stock sales).

As to the second point, Plaintiff need not allege that Director Defendants *maximized* the value gained from their alleged impropriety or "misus[ed] [the] information more effectively" to state a claim.[84] The Director Defendants made a lot of money from the trades. Maximum overindulgence is not a necessary element.

For these reasons, Plaintiff successfully alleges that the Director Defendants face a substantial likelihood of liability for insider trading under *Brophy*. Demand was therefore futile as to the Director Defendants.

### 3. The Officer Defendants

Where the factual allegations underlying claims against officers are "congruous" with the facts underlying claims against directors, then adequately alleging a substantial likelihood of liability as to the directors satisfies the demand requirement concerning the claims against the officers.[85] This is because an investigation of the officers "would necessarily implicate the same set of facts" at issue in the claim against the directors.[86]

Plaintiff alleges that all Defendants received the same MNPI at the same time and traded on that MNPI around the same time. The factual allegations are therefore

---

[84] *Pfeiffer v. Toll*, 989 A.2d 683, 694 (Del. Ch. 2010); *see also In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("[I]t is not a defense that [the defendants] could have committed an even larger breach of their fiduciary duties[.]").

[85] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *47 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021).

[86] *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020); *see also Hughes v. Hu*, 2020 WL 1987029, at *18 (Del. Ch. Apr. 27, 2020) (holding that demand was futile as to a count that "necessarily treads the same path" as a count for which demand is futile).

27

congruous, and the analysis of the claims against the Officer Defendants "tread the same path" as the claims against the Director Defendants.[87]  Given the near-total overlap in allegations, the conclusion that the Director Defendants face a substantial likelihood of liability in connection with the *Brophy* claims renders demand futile under Rule 23.1 as to the claims against the Officer Defendants.

The *Brophy* claims against the Officer Defendants are also reasonably conceivable under Rule 12(b)(6).[88]  The facts alleged against the Officer Defendants are identical to those against the Director Defendants except for knowledge.  The court inferred that the Director Defendants knew of the Andersen Report due to the unanimous written consent, which the Officer Defendants did not execute.

Nevertheless, Plaintiff has adequately alleged that the Officer Defendants knew of the contents of the Andersen Report.  Plaintiff alleges that Chatterjee, Choi, and Haas attended meetings where interim Andersen valuations were reviewed.  Plaintiff also alleges that all the Officer Defendants attended the February 23, 2021 meeting where the Board approved the Direct Listing and were presented with "market trends, valuation over time and an analysis of potential outcomes, including first day trading" in relation to the Direct Listing.[89]  Plaintiff further alleges that management assisted in the preparation of the Anderson report.  Drawing plaintiff-

---

[87] *Hughes*, 2020 WL 1987029, at *18.

[88] The complaint sufficiently alleges the materiality of the Andersen Report for the reasons described above.  It also sufficiently alleges scienter given the size and timing of the Officer Defendants' trades.

[89] Compl. ¶ 90.

friendly inferences from these facts, is reasonably conceivable that the Officer Defendants knew the Andersen Valuation given their presence at these meetings and involvement with the report. The motion to dismiss the *Brophy* claim against the Officer Defendants is therefore denied.

## B. Unjust Enrichment

Generally, "where the Court does not dismiss a breach of fiduciary duty claim, it . . . does not dismiss a duplicative unjust enrichment claim."[90]  That is particularly true here, as "*Brophy* is a species of unjust enrichment" that focuses on the benefit to the wrongdoer.[91]  Accordingly, Defendants based their argument to dismiss Count II for unjust enrichment on Plaintiff's failure to state the predicate *Brophy* claim. Defendants thereby acknowledge that Plaintiff's claim for unjust enrichment rises or falls with the *Brophy* claim.[92]  Accordingly, the motion to dismiss Count II for unjust enrichment is denied.

## III.  CONCLUSION

Defendants' motions to dismiss under Rule 23.1 and Rule 12(b)(6) are denied.

---

[90] *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014).

[91] *Clovis*, 2019 WL 4850188, at *17 n.236 ("*Brophy* is a species of unjust enrichment that does not require a showing of actual harm to the corporation, but instead focuses 'on the public policy of preventing unjust enrichment based on the misuse of confidential corporate information.'" (quoting *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 840 (Del. 2011)); *see also In re Fitbit, Inc.*, 2019 WL 190933, at *4 n.26 (Del. Ch. Apr. 14, 2019) ("[T]he public policy underlying a *Brophy* claim is to prevent unjust enrichment based on the misuse of confidential corporate information." (internal citations omitted)).

[92] Defs.' Opening Br. at 38.